<u>NOT FOR PUBLICATION</u>

## <u>UNITED STATES DISTRICT COURT</u>
## <u>FOR THE DISTRICT OF NEW JERSEY</u>

---

```
                                         :
ENVIROSAFE PRODUCTS CORP.,               :
                                         :
                Plaintiff,               :
                                         :        Civil Action No. 08-0508 (JAG)
                v.                       :
                                         :              OPINION
MONARCH INDUSTRIES, INC.,                :
                                         :
                Defendant.               :
                                         :
```

---

<u>GREENAWAY, JR., U.S.D.J.</u>

This matter comes before this Court on the Motion For Partial Summary Judgment As To Count IV And Count V Of The Complaint ("Motion"), filed by Defendant Monarch Industries, Incorporated.  (Docket No. 21.)  For the reasons set forth below, Defendant's Motion is denied.

## BACKGROUND

**I.      The Parties**

Defendant Monarch Industries, Incorporated, ("Defendant") is a Rhode Island corporation, with its principal place of business in Warren, Rhode Island.  (Affidavit of Michael Friedman In Support of Defendant's Motion For Summary Judgment ("Friedman Aff.") ¶ 2.) Defendant is in the business of manufacturing and installing architectural millwork for commercial customers.  (Friedman Aff. ¶ 3.)

Plaintiff Envirosafe Products Corporation ("Plaintiff") is a New Jersey corporation, with

its principal place of business in Livingston, New Jersey.  (Compl. 1.)  Plaintiff has two

employees: Stephan Lerman ("Lerman") and his wife.  (Affidavit of Christopher H. Little In

Support of Defendant's Motion For Partial Summary Judgment, Transcript of Stephan Lerman's

Deposition ("Lerman Dep.") 11:4-6.)  At all times relevant to the Complaint, Plaintiff was

involved in the business of distributing specialty building materials, and supplying and installing

architectural millwork.  (Lerman Dep. 11:9-12:2.)  In addition, Plaintiff alleges that, through

Lerman, it was involved in brokering contracts for other suppliers and installers of architectural

millwork.  (Id. 39:16-25.)

Plaintiff filed a five-count Complaint against Defendant.  This Motion addresses two of

the counts – Counts IV and V.  Both counts concern Plaintiff's allegation that Defendant failed to

pay Plaintiff for brokerage services, regarding its efforts to secure a construction contract for

Defendant.  (Compl. 5-6.)

The relevant facts related to the alleged oral brokerage agreement and the construction

project at the heart of this Motion are addressed below.[1]

---

[1]Because the pending Motion does not concern Counts I-III of the Complaint, this
Opinion omits facts relevant only to those counts.

In addition, this Court notes that Plaintiff furnished neither a responsive statement of
material facts addressing movant's statement of undisputed material facts, nor a supplemental
statement of disputed material facts.  Pursuant to Local Civil Rule 56.1, this Court shall deem
undisputed for purposes of this summary judgment motion Defendant's statement of undisputed
material facts.  The overwhelming majority of Defendant's Rule 56.1 statement, however, does
not refer to the dispute currently before this Court.  This Court will, therefore, supplement
Defendant's statement of undisputed material facts with references to the declaration of Stephan
Lerman and affidavits filed by Defendant in support of its Motion.

Further, though in its opposition brief Plaintiff alludes to depositions providing a basis for
relying on factual assertions made in the brief, it did not furnish this Court with exhibits
containing the deposition transcripts to which Plaintiff refers.  This Court lacks a basis for
relying on Plaintiff's assertions of fact that rely on depositions not submitted to this Court.  See
Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported

II.     **The Alleged Oral Brokerage Agreement**

Lerman testified that he has worked as a broker for Defendant on several jobs over the past ten years.  (Lerman Dep. 164:5-7.)  Lerman described the brokerage relationship as "a gentlemen's handshake agreement" that initially took place in the late 1990s between himself, Jim Vecchione ("Vecchione"), Defendant's Vice President of sales at that time, and Howard Gewandter ("Gewandter"), Defendant's CEO at the time.  (Id. 32:9-13, 39:10-40:10.)  The agreement was not in writing.  (Id. 40:5-6.)  According to Lerman, however, "everybody [employed by Defendant] knew of my arrangement."  (Id. 163:2-9.)  Emails sent from Lerman to Michael Friedman ("Friedman"), President of Defendant, and David Duclos ("Duclos"), Defendant's Director of Millwork Operations, who were at all relevant times during the PS/IS 93 Project[2] employees of Defendant, indicate that Lerman sought to formalize the agreement in writing in June 2006.  (Friedman Aff. ¶¶ 6-7; Ex. D-30.)

Lerman testified that the nature of the brokerage relationship was that he would "solicit work on behalf of [Defendant] through [Plaintiff] as an independent agent, not as an employee of [Defendant]; and then I would be entitled to a commission or what we referred to as a spread."  (Id. 39:17-21.)  The "spread" is the difference between the quoted price provided by Defendant and the actual price the contractor agreed to pay Defendant as subcontractor for the job.  (Id. 164:7-11.)  For instance, "let's say . . . [Defendant's] price to me was $100,000, and then I sold the job for $150,000.  Then I would be entitled to the $50,000 spread between those two

---

allegations . . . and pleadings are insufficient to repel summary judgment.").

[2]The PS/IS 93 Project is a construction project that is discussed in detail in subsection III, below.

numbers."  (Id. 39:21-25.)

### III.    The PS/IS 93 Project

Sometime around 2004, Lerman became involved in a project for the installation of
architectural millwork at a public school in Manhattan, PS/IS 93 ("PS/IS 93 Project" or
"Project").[3]  (Id. 34:22-35:4.)  Lerman solicited the company that had been hired as the project
coordinator on the PS/IS 93 Project, Bovis Lend Lease ("Bovis"), in order to get the plans and
specifications for the Project.  (Id. 34:24-35:17.)  Lerman then contacted John Lopes ("Lopes"),
Bovis' senior project manager on the PS/IS 93 Project, in order to review the architectural
drawings, with respect to the architectural millwork and custom woodwork specified.  (Id. 35:23-
36:10, 37:1-4.)

On June 8, 2005, after meeting with Lopes, Lerman submitted to Lopes a bid for the
PS/IS 93 Project.  (Id. 34:24-35:1, 35:23-36:4, 70:24-71:2; Ex. D-11.)  The bid, for $790,000,
which Lerman submitted on behalf of Mountaintop Cabinetry Manufacturing Company
("Mountaintop"), was generated by Brad Dryer ("Dryer"), Mountaintop's owner.[4]  (Lerman Dep.
70:24-71:9; Ex. D-11.)  In the bid submission, Lerman represented himself to Lopes as an
employee of Mountaintop.  (See Ex. D-11 (fax from "Stephan Lerman (Mountaintop Cabinetry

---

[3]In the parties' briefs, affidavits, and declarations, the school is alternately referred to as
PS/IS 93 and PS/IS 210.  Defendant explains that the confusion stems from the fact that the
Project was initially called PS/IS 93, but that later, the same Project was renamed PS/IS 210.
(Mot. 1 n.1.)  Lerman also testified that PS/IS 93 and PS/IS 210 refer to the same school.
(Lerman Dep. 18:21-19:1.)  For purposes of clarity, the school will be referred to as PS/IS 93 in
this Opinion.

[4]Apparently, Plaintiff could not be the subcontractor on the Project because it could not
achieve the bonding required by the New York School Construction Authority for the Project.
(Lerman Dep. 84:19-85:2.)

Mfg. Co.)" to Lopes, wherein Lerman repeatedly refers to Mountaintop in the first-person plural).)  After submitting the bid, Lerman and Dryer met with Lopes in Manhattan to clarify the scope of work to be performed, and the bid was adjusted to $795,000.  (Id. at 80:25-81:11.) Mountaintop, however, "bowed out" of the job because it refused to get a bond for PS/IS 93 Project (id. at 71:25-72:1), at which time Lerman immediately contacted Lopes to inform him that the contract could not go forward.  (Lerman Dep. 77:11-14; Ex. D-13.)

At the same time Lerman informed Lopes that Mountaintop could not go forward with its bid, Lerman suggested that Bovis consider Defendant for the job.  (Ex. D-13.)  Lerman represented that he was Defendant's "Director of Business Development for the NY-NJ area" and concluded the email that suggested Bovis consider Defendant for the PS/IS 93 Project by signing, "Stephen, Monarch Industries."  (Id.)  At around the same time, it appears that Lerman sent Defendant information about the PS/IS 93 Project for the purpose of getting an initial quote from Defendant for the work.  (See id. ("I have already spoken to Monarch and am sending them the drawings for review."); Ex. D-16 (initial quote from Defendant for PS/IS 93 Project).)

On January 3, 2006, Defendant sent Plaintiff its initial quote of $499,000 for the architectural millwork on the PS/IS 93 Project.  (Ex. D-16.)  On January 10, 2006, Plaintiff sent Defendant a more detailed definition of the scope of work for which Defendant was bidding. (Ex. D-14.)  In response, on January 23, 2006, Defendant issued to Plaintiff a revised quote of $635,956.  (Ex. D-17.)  On January 24, 2006, Lerman and Duclos met with Lopes in Manhattan to undertake an item-by-item review of the work required for the Project.  (Lerman Dep. 99:5-24.)

Based on that review, on January 25, 2006, Defendant adjusted its bid to $795,000.  (Ex.

D-18.)  On January 26, 2006 Lopes accepted the bid on behalf of Bovis, stating Bovis' "intent to enter into Contract with [Defendant] for the Custom Casework (Millwork and Wood Doors) PS IS 93 Scope of Work."  (Ex. D-15.)  A contract between Defendant and Bovis was signed on February 16, 2006.  (Affidavit Of Stephen Gaddes In Support Of Defendant's Motion For Partial Summary Judgment, Ex. 1.)

**IV.     Plaintiff's Claims Relevant To The Pending Motion**

Lerman claims that Defendant owes Plaintiff "approximately $297,000," which is close to the difference between Defendant's initial quote to Plaintiff for work on the PS/IS 93 Project, $499,000, and the amount Bovis contracted to pay Defendant for that work, $795,000.[5]  (Id. 28:9-18.)

Plaintiff filed a five-count Complaint on January 26, 2008.  (Docket No. 1.)  Count IV of the Complaint alleges that Defendant breached its contract with Plaintiff by failing and refusing to pay it the amount due for brokering the PS/IS 93 Project contract on Defendant's behalf, pursuant to the parties' alleged oral brokerage contract.  (Compl. 5.)  Count V is for promissory estoppel arising out of Defendant's alleged failure and refusal to pay Plaintiff the amount promised by Defendant for Plaintiff's brokerage services related to the PS/IS 93 Project.  (Id. 5-6.)[6]  On April 14, 2009, Defendant filed the pending Motion for partial summary judgment as to Counts IV and V of the Complaint.  (Docket No. 21.)

---

[5]This Court notes that the difference between $499,000 and $795,000 is $296,000.

[6]Counts I-III (Compl. 3-4) do not concern the PS/IS 93 Project and are not germane to the pending Motion.

## LEGAL STANDARD

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'" In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, party must show *affirmatively* the absence of a genuine issue of material fact:  it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original)  (internal citations omitted).)  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . .

7

. the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

"Rule 56(c) mandates the entry of judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

**ANALYSIS**

Defendant moves for partial summary judgment with respect to Counts IV and V of Plaintiff's Complaint.  Defendant argues that Count IV, which alleges that Defendant breached its contract to pay Plaintiff a brokerage fee with respect to the PS/IS 93 Project, fails because, pursuant to New York law, the oral agreement to pay such a fee is within the statute of frauds and is unenforceable.  Defendant also argues that Count V, which states a claim for promissory estoppel related to the brokerage fee generated from the PS/IS 93 Project, fails because Plaintiff solely seeks expectation damages, and such damages are not available under the theory of promissory estoppel.

Further, Defendant argues that Plaintiff's allegations do not approach the unconscionable injury standard required by New York law to advance a promissory estoppel claim to defeat the statute of frauds.  In the alternative, Defendant argues that Counts IV and V fail as a matter of law because the alleged brokerage agreement was not authorized by Defendant.[7]

Plaintiff counters that Rhode Island law should apply, and that, pursuant to Rhode Island law, the alleged oral brokerage agreement is enforceable because it is not within the statute of frauds.  Plaintiff also argues that the alleged oral brokerage agreement was entered into by Defendant's former CEO, who had authority to enter into such an agreement on Defendant's behalf.

For the reasons addressed below, Defendant's Motion is denied as to both Counts.

_____

[7]This Court does not consider the argument proffered for the first time in Defendant's Reply, that the alleged oral agreement at issue is not a contract as a matter of law.  E.g. Leitch v. MVM, Inc., No. 03-4344, 2004 WL 1638132, at *6 (E.D. Pa. July 22, 2004) ("[W]e will not consider this argument here since it was made for the first time in [the defendant's] reply to the plaintiff's opposition to the motion partially to dismiss.").

I.      **Choice Of Law**

The above summary demonstrates the parties' disagreement about which state's law

applies to the alleged oral brokerage agreement.  Defendant argues that New York law governs

the alleged oral brokerage agreement, while Plaintiff counters that Rhode Island law governs.

The determination of the proper choice of law is important here, because Defendant argues that

the selection of New York law would be fatal to Plaintiff's breach of contract claim, and Plaintiff

argues that its claim survives under Rhode Island law.

Were this Court able to determine the proper choice of law regarding Counts IV and V,

Defendant's Motion would only need to be considered pursuant to that state's laws.  For the

reasons discussed below, this Court finds that there remain unresolved genuine issues of material

fact such that this Court is unable to reach a result in the choice of law analysis.  As a result,

Defendant must show that it is entitled to summary judgment as to Counts IV and V under both

New York and Rhode Island law.  The analysis of Defendant's Motion under the law of both

states follows the choice of law analysis below.

A.      **Choice of Law:  Legal Standard**

A federal court with diversity jurisdiction must apply the choice of law principles of the

forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  Under New

Jersey law, the governing law in a contract case is that of the jurisdiction with the most

significant relationship and closest contacts with the transaction and the parties.  Keil v. Nat'l

Westminster Bank, 710 A.2d 563, 569 (N.J. Super. Ct. App. Div. 1998); State Farm Mut. Auto.

Ins. Co. v. Estate of Simmons,  417 A.2d 488, 491-92 (N.J. 1980)  To determine which state has

more significant contacts with the parties and the contract, New Jersey courts look to the

following non-exclusive contacts listed in § 188 of the Restatement (Second) of Conflict of

Laws:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business
> of the parties.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1969); see, e.g., Keil, 710 A.2d at

569-570.

In addition, courts consider the factors relevant to the applicable rule of law in § 6 of the

Restatement:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those
> states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1969); see Gen. Ceramics Inc. v. Firemen's

Fund Ins. Cos., 66 F.3d 647, 653 (3d Cir. 1995).  There is a presumption that the law of the place

of contracting should apply to the interpretation of the contract.

> Because the law of the place of contract "generally comport[s] with the
> reasonable expectations of the parties" concerning the applicable and
> controlling legal principles, "that forum's law should be applied unless
> the dominant and significant relationship of another state to the parties or
> the underlying issue dictates that this basic rule [should] yield."

Keil, 710 A.2d at 569 (quoting Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 629

A.2d 885 (N.J. 1993)).

11

### B.    Choice of Law:  Analysis

Defendant argues that New York provides the governing law, while Plaintiff counters that Rhode Island law should apply.  As the analysis below demonstrates, it is anything but clear which state's law should apply to disputes about the alleged oral brokerage contract at issue in this Motion.

Neither party has put before this Court evidence sufficient for it to perform a conclusive choice of law analysis.  Under New Jersey choice of law rules, this Court must first look at the § 188 factors in order to determine which state has the most significant contacts with the contract and the parties.  There is no evidence provided by either party as to the place of contracting and the place of contract negotiation, the first and second § 188 factors.  Defendant argues that because the alleged oral brokerage agreement concerns the PS/IS 93 Project in New York, and the parties met in Manhattan to discuss the Project, New York is therefore the place of contracting.  The contract for the PS/IS 93 Project, however, is not the contract at issue in this Motion.  Rather, the contract at issue is the alleged oral brokerage contract that Plaintiff claims governed the terms under which Plaintiff brokered the PS/IS 93 contract on Defendant's behalf.

As Lerman testified in his deposition, the "gentlemen's handshake agreement" predated the PS/IS 93 Project by almost ten years.  (Lerman Dep. 39:10-40:15.)  It is the place of that "gentleman's handshake agreement," and the place of the negotiations that led to that handshake, that are the appropriate considerations in a choice of law analysis.

Unfortunately, there is precious little in the record before this Court that indicates where the negotiations and possible contracting regarding the alleged oral brokerage agreement took place.  Lerman testified that the oral brokerage agreement was "basically agreed upon and then

was exercised when I brought my first Project in." (<u>Id.</u> 40:13-15.)  That contract concerns a project in Brooklyn (<u>Id.</u> 40:13-21), but it is not clear whether the negotiations and alleged agreement between Lerman and Defendant occurred at the site, at Defendant's office, at Plaintiff's office, or somewhere else.

Plainly, there remain genuine issues as to material facts regarding the place of alleged negotiation and contracting of the oral brokerage agreement.

The third § 188 factor, the place of performance, is also unclear.  The performance arguably took place, if it took place at all, where Lerman brokered agreements with third-parties on Defendant's behalf, and also where Defendant paid Lerman for his brokerage services.  As mentioned earlier, neither party provides an adequate factual basis to make a determination regarding this inquiry.  At this summary judgment phase, conjuring plausible scenarios is outside of this Court's provenance.  <u>See</u> <u>Marino</u>, 358 F.3d at 247 ("In considering a motion for summary judgment, a district court may <u>not</u> make credibility determinations . . .").  Hence, albeit plausible, there is no certainty that payments, if any, were made by Defendant to Plaintiff pursuant to an alleged brokerage agreement generated in Rhode Island, Defendant's place of business, and received by Plaintiff in New Jersey, its place of business.  Likewise, the plausibility of Lerman having brokered agreements with third-parties at the construction sites is beyond this Court's purview.[8]  Genuine issues as to material facts exist regarding the place of performance.

Circumstantial evidence regarding the fourth § 188 factor, the location of the contract's

---

[8]Lerman testified that he has brokered three contracts on Defendant's behalf, and all three have been in New York.  (<u>See</u> Lerman Dep. 40:16-41:3 (brokerage services provided with respect to contracts in Brooklyn and Long Island, in addition to the PS/IS 93 Project in Manhattan).)

subject matter, militates slightly in favor of New York law.  Though the alleged oral brokerage agreement did not indicate that it was bound by geographical location, Lerman's testimony indicates that the brokerage agreement has only been invoked by Plaintiff with regard to three projects, all of which were located in New York.  (Id. 40:16-41:5.)  While there is no explicit location of the subject matter of the alleged oral agreement, circumstantial evidence indicates that New York has been the location of all of the contracts Plaintiff alleges have been governed by the agreement to this point.  Yet such circumstantial evidence is not sufficient to demonstrate that no genuine issue of material fact exists as to the location of the contract's subject matter. Defendant does not suggest, let alone put forward any evidence, that the alleged oral brokerage agreement only contemplated the brokerage of contracts to be performed in the state of New York.

The fifth and final factor under § 188 is the domicil, residence, nationality, place of incorporation, and place of business of the parties.  Plaintiff is a New Jersey corporation, domiciled in New Jersey, with its place of business in New Jersey.  Defendant is a Rhode Island corporation, domiciled in Rhode Island, with its place of business in Rhode Island.  This factor clearly militates against the application of New York law, and in favor of the application of either New Jersey or Rhode Island law.

In conclusion, evaluation of the Restatement § 188 factors does not indicate which state has the most significant contacts with the parties and the alleged oral brokerage agreement. Further, it would be a pointless exercise in redundancy for this Court to address the additional factors that New Jersey's choice of laws rules contemplate, for they, like the § 188 factors addressed above, depend on facts that have not been established by the parties.  Neither party has

14

alleged sufficient facts to indicate which state's laws should govern this dispute.

## II.   Analysis Of Defendant's Motion For Partial Summary Judgment As To Claims IV And V

As noted above, the proper choice of law is not resolved.  Thus, Defendant's motion for partial summary judgment as to Counts IV and V of the Complaint can only be granted if it is mandated under both New York and Rhode Island law.  For the reasons addressed below, this Court denies Defendant's Motion as to both counts.

### A.   Count IV:  Breach of Contract

Defendant moves this Court to grant summary judgment against Plaintiff for Count IV of its complaint, for breach of the alleged oral brokerage agreement.  Defendant asserts two grounds for its Motion as to Count IV:  (1) that the alleged oral brokerage agreement falls within the statute of frauds, and is therefore unenforceable, and (2) that no employee of Defendant, authorized to bind Defendant to contracts, agreed to the alleged oral brokerage agreement with Plaintiff.

#### (1)   Statute of frauds

Defendant first argues that under New York law, the alleged oral brokerage agreement falls under the statute of frauds, and is therefore void because it is not in writing.  As discussed above, however, it is not clear whether New York or Rhode Island law applies to Plaintiff's breach of contract claim.  For Defendant's statute of fraud argument to prevail, there must be an uncontested factual basis for finding that Plaintiff's alleged oral brokerage contract is within the statute of frauds under both New York and Rhode Island law.  Because Plaintiff's breach of contract claim is not within Rhode Island's statute of frauds, Defendant's motion for summary judgment as to Count IV fails.

15

Rhode Island's statute of frauds provides:

No action shall be brought:
(1) Whereby to charge any person upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer time than one year;
(2) Whereby to charge any person upon any agreement made upon consideration of marriage;
(3) Whereby to charge any trustee under any express trust, or any executor or administrator, upon his or her special promise to answer any debt or damage out of his or her own estate;
(4) Whereby to charge any person upon his or her special promise to answer for the debt, default, or miscarriage of another person;
(5) Whereby to charge any person upon any agreement which is not to be performed within the space of one year from the making thereof;
(6) Whereby to charge any person upon any agreement or promise to pay any commission for or upon the sale of any interest in real estate;
(7) Except in cases to which the uniform commercial code (title 6A) applies, whereby to charge any person upon any contract for the sale of personal property beyond five thousand dollars ($5,000) in an amount or value of remedy, unless the promise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized.

R.I. Gen. Laws § 9-1-4.  Neither side disputes that the alleged oral brokerage agreement is not in writing.  The question, therefore, is whether the alleged oral brokerage agreement is one "not to be performed within one year from the making thereof."[9]  R.I. Gen. Laws § 9-1-4(5).

It appears that there is no Rhode Island case law directly on point.  The issue is addressed, however, by the Restatement (Second) of Contracts.[10]  Section 130 of the Restatement (Second) of Contracts addresses the statute of frauds.  Comment A to § 130 states

_____

[9]The alleged oral brokerage agreement clearly does not fall within any other subsection of the statute.

[10]The Rhode Island Supreme Court has repeatedly embraced the Restatement (Second) of Contracts.  E.g. Cathay Cathay Inc. v. Vindalu, LLC, 962 A.2d 740, 745-46 (R.I. 2009) (referring to Restatement §§ 302, 309 with respect to third-party contract beneficiary's ability to enforce a promise made between two other people for the benefit of said third person).

16

that the statute of frauds renders unenforceable "only those contracts whose performance *cannot possibly be completed within a year*." RESTATEMENT 2D CONTRACTS § 130, cmt. a (1981) (emphasis added).  It is possible, however, that performance of the alleged oral brokerage agreement could have been completed within a year.  E.g., id., Illustration 3 ("A and B, a railway, agree that A will provide grading and ties and B will construct a switch and maintain it as long as A needs it for shipping purposes.  A plans to use it for shipping lumber from adjoining land which contains enough lumber to run a mill for 30 years, and uses the switch for 15 years.  The contract is not within the one-year provision of the Statute.").

A contract within the statute of frauds as set forth in subsection 5 of Rhode Island General Law 9-1-4, in contrast, is one where the terms of the contract make it impossible for the parties to complete their obligations under the contract within a year.  E.g., id., Illustration 4 ("A orally promises B to sell him five crops of potatoes to be grown on a specified farm in Minnesota, and B promises to pay a stated price on delivery.  The contract is within the Statute of Frauds.  It is impossible in Minnesota for five crops of potatoes to mature in one year.").

The alleged oral brokerage agreement at issue here contains no conditions that would have made it impossible for the parties to complete their obligations under the contract within a year.  The alleged oral brokerage agreement is not within Rhode Island's statute of frauds.  Thus, if the oral brokerage agreement exists, it is enforceable under Rhode Island law.

Here, the alleged oral brokerage agreement is not within Rhode Island's statute of frauds.  Defendant's motion to dismiss Count IV on the ground that the alleged agreement falls within

17

the statute of frauds, and is thus unenforceable, is denied.[11]

        **D.     Lack of authority**

In the alternative, Defendant moves for summary judgment with respect to Count IV on the ground that the alleged oral brokerage agreement was not agreed to by an agent of Defendant with the authority to authorize such an agreement.  This ground for summary judgment is also denied.

Defendant states that Lerman asserts that he negotiated the alleged oral brokerage agreement with Duclos, who was not authorized to enter into such contracts on Defendant's behalf.  (Motion 44; Friedman Aff. ¶ 6.)  Lerman, however, testified that the alleged oral brokerage agreement was approved by Gewandter, Defendant's former CEO.  (Lerman Dec. 40:3-4.)  Friedman, Defendant's current President, submitted a declaration stating that Gewandter was one of a limited number of persons authorized to bind Defendant to contracts.  (Friedman Aff. ¶ 6(e).)  There is, therefore, a genuine issue as to a material fact regarding whether Gewandter bound Defendant to the alleged oral brokerage contract.  Celotex, 477 U.S. at 322-23.

For the reasons discussed above, Defendant's motion for summary judgment as to Count IV is denied.

---

[11]In order to deny Defendant's statute of frauds argument, it is sufficient to find that Defendant's motion for summary judgment fails under Rhode Island law, and this Court need not consider whether the alleged oral brokerage agreement is within the statute of frauds pursuant to New York law, and thus unenforceable.

E.      **Count V:  Promissory Estoppel**

Defendant also moves for summary judgment as to Count V of the Complaint, which states a claim for promissory estoppel based on Defendant's failure to pay Lerman for his brokerage services with respect to the PS/IS 93 Project.  This Court finds that there exist genuine issues as to a material fact regarding this claim.  As a result, Defendant's motion for partial summary judgment as to Count V of the Complaint is also denied.

"To establish promissory estoppel" under Rhode Island law, "there must be:  (1) A clear and unambiguous promise; (2) Reasonable and justifiable reliance upon the promise; and (3) Detriment to the promisee, caused by his or her reliance on the promise." Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003).  Similarly, under New York law, "[t]he elements of a cause of action based upon promissory estoppel are a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made and an injury sustained in reliance thereon." Williams v. Eason, 854 N.Y.S.2d 477, 479 (N.Y. App. Div. 2008).

As discussed above, the existence of the alleged oral brokerage agreement is unclear. Defendant fails to come forward with uncontested evidence establishing that such an agreement does not exist, that Lerman did not reasonably and justifiably/foreseeably rely upon that agreement, or that Lerman was not harmed by his reliance on the agreement.  Filippi, 818 A.2d at 626; Williams, 854 N.Y.S.2d at 479.  Summary judgment as to this claim must be denied, because there exist genuine issues as to material facts and the evidence does not establish that Defendant is entitled to judgment as a matter of law.  Celotex, 477 U.S. at 322.

**CONCLUSION**

In conclusion, for the reasons stated above, Defendant's Motion For Partial Summary

Judgment As To Count IV and Count V Of The Complaint is denied.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

December 11, 2009

20